# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| **VERNON D. ALLEN, et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No. _____** |
| ) | |
| **v.** ) | |
| ) | |
| **JACOBS ENGINEERING GROUP, INC.,** ) | |
| **ROGERS GROUP INVESTMENTS, INC.,** ) | |
| **ENSAFE ENGINEERING SERVICES and** ) | |
| **ENSAFE, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## DEFENDANT JACOBS ENGINEERING GROUP, INC.'S NOTICE OF REMOVAL TO FEDERAL COURT PURSUANT TO 28 U.S.C. § 1442(a)(1)

Defendant, Jacobs Engineering Group, Inc. ("Jacobs"), with a full reservation of rights, hereby gives notice of the removal of the above-entitled action from the Roane County Circuit Court, State of Tennessee, to the United States District Court for the Eastern District of Tennessee, Knoxville Division, pursuant to 28 U.S.C. § 1442(a)(1). In support of its removal, Jacobs respectfully states as follows:

### BACKGROUND

On March 9, 2018, Plaintiffs, through their attorneys, filed an action styled *Vernon D. Allen, et al. v. Jacobs Engineering Group, Inc., et al.,* Case No. 2018-CV-30 in the Circuit Court for Roane County, Tennessee ("Complaint"). Jacobs was served with a Civil Summons and the Complaint on March 20, 2018 via process server. In accordance with 28 U.S.C. § 1446(a), true and accurate copies of all process, pleadings, and orders served upon Jacobs (including a Civil Summons and Complaint) are attached hereto as **Exhibit 1**. 28 U.S.C. § 1446(a).

Plaintiffs' claims against Jacobs relate to an ash spill that occurred on December 22, 2008, at the Kingston Fossil Plant in Harriman, Roane County, Tennessee (the "KIF Plant"), which is owned, operated, and managed by the Tennessee Valley Authority ("TVA"). *See Chesney v. Tenn. Valley Auth.*, 782 F. Supp. 2d 570, 572 (E.D. Tenn. 2011). The spill occurred when one of the containment dikes that retained a pond used to dispose of coal ash sludge produced at the KIF plant failed. *Id*. at 573. The burning of coal at the KIF Plant's coal fired electricity generation plant created the coal ash sludge that was spilled. As a result of the dike failure, approximately 5.4 million cubic yards of coal ash sludge spilled from the 84-acre containment pond to an adjacent area of about 300 acres, consisting of primarily the Watts Bar Reservoir, the Clinch and Emory Rivers, and shoreline properties owned by the government and the public. *Id.*

In their Complaint, Plaintiffs seek damages for personal injuries and illnesses they have allegedly sustained as a result of exposure to allegedly "toxic" and "hazardous" substances associated with the post-spill clean-up, removal and recovery of fly ash at the KIF Plant (hereinafter the "Kingston Ash Recovery Project"). [*See* Complaint at ¶¶ 1, 8.] Plaintiffs allege in their Complaint that they were "independent contractors" who performed fly and bottom ash remediation at the KIF ash spill site.[1] [*Id.* at ¶ 8.]

Plaintiffs allege that Jacobs entered into a contract with TVA, whereby Jacobs was "directed by TVA to provide a safe environment for all workers," including Plaintiffs working on the cleanup site. [*Id*.] Plaintiffs contend that Jacobs acted "outside the scope of direction and authority conferred by TVA and contrary to its adopted Site Wide Safety and Health Plan (SWSHP)," and deviated from all laws, regulations and other directives of TVA. [*Id.*] Plaintiffs assert that Jacobs, while working under contract with TVA to provide a safe working environment

---

[1] Plaintiffs do not allege the dates that they worked on the site.

for individuals (including Plaintiffs) working on the fly ash cleanup project, committed tortious acts related to its decision-making, public notifications, training of its employees, and oversight of air monitoring, testing, and removal of the fly ash.  [*See generally* Complaint.]

**RELEVANT LEGAL STANDARDS**

28 U.S.C. § 1442, the federal officer removal statute, provides:

> "(a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, *for or relating to* any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1) (emphasis added).

The federal officer removal statute is neither "narrow" nor "limited," and the policy underlying the statute "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969); *see also Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999).  Consistent with this directive, the Sixth Circuit recognizes that the federal officer statute is given "broad scope"– one that is "broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (quoting *Willingham*, 395 U.S. at 406-07).  This liberal interpretation furthers "[o]ne of the primary purposes of the removal statute" which is "to have such [federal] defenses litigated in the federal courts." *Id.*

Original federal jurisdiction is not required for removal pursuant to 28 U.S.C. § 1442(a)(1). *See Willingham*, 395 U.S. at 406 ("the right of removal under § 1442(a)(1) is made absolute whenever a suit in state court is for any act 'under color' of federal office, regardless of whether

3

the suit could originally have been brought in federal court."). And while all defendants must consent to removal under 28 U.S.C. § 1441, a federal officer or agency defendant, or any person acting under that officer, can unilaterally remove a case under 28 U.S.C. § 1442. *Id*. at 406 ("the right of removal under §1442 is made absolute whenever suit in state court is for any act 'under color' of federal office"); *see also Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981); *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965) ("[I]t is settled that the filing of a petition for removal by a single federal officer removes the entire case to federal court.").

A defendant who is not a federal officer or federal agency must satisfy three elements to invoke the federal officer statute: First, "that it is a 'person' within the meaning of the statute who 'acted under a federal officer.'" *Bennett*, 607 F.3d at 1085 (citing and quoting 28 U.S.C. § 1442(a)(1)). Second, "that it performed the actions for which it is being sued 'under color of federal office.'" *Id.* Third, "that it raised a colorable federal defense." *Bennett*, 607 F.3d at 1085 (citing *Jefferson Cty., Ala.*, 527 U.S. at 431; *Lay v. Burley Stabilization Corp.*, 312 Fed. Appx. 752, 759 (6th Cir. 2009) (unpublished) (Moore, J. concurring); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008))*; see also Mesa v. California*, 489 U.S. 121, 139 (1989); *Mays v. City of Flint, Mich.*, 871 F.3d 437, 442–43 (6th Cir. 2017).

"[I]n 2011, Congress amended § 1442(a)(1) to cover actions "for *or relating to* any act under color of [federal] office," adding the words "or relating to." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (citing Removal Clarification Act of 2011, Pub. L. No. 112–51, 125 Stat. 545). "This new language broaden[ed] the universe of acts that enable federal removal

4

such that there need be only a *connection or association* between the act in question and the federal office." *Sawyer,* 860 F.3d at 258 (citations and internal quotation omitted) (emphasis in original).

## ARGUMENT

## REMOVAL BY JACOBS PURUSANT TO 28 U.S.C. § 1442(a)(1) IS APPROPRIATE.

As further discussed below, the three elements identified in *Bennett* that Jacobs must satisfy for the Federal Officer Removal statute to apply are easily established in this case. Jacobs' removal is timely under 28 U.S.C. § 1446(b), as Jacobs has filed this Notice of Removal within thirty (30) days of service of Plaintiffs' Complaint. Contemporaneously with or promptly after filing this Notice of Removal, Jacobs has filed written notice of this Removal with the Clerk of the Circuit Court for Roane County, Tennessee and served the same on all parties, as required by 28 U.S.C. § 1446(d). A true and accurate copy of Jacobs' Notice of Removal filed with the Roane County Circuit Court is attached hereto as **Exhibit 2**. Because Jacobs has satisfied the requirements of 28 U.S.C. §§ 1442 and 1446, removal of this action under the Federal Officer Removal statute is appropriate.[2]

### A. Jacobs Is A "Person" Who "Acted Under a Federal Officer."

1. Jacobs is a "person" under federal law.

As a matter of law, a corporation constitutes a "person" for the purposes of federal officer removal under 28 U.S.C. § 1442. *See* 1 U.S.C. § 1 (defining the word "person" to include corporations); *see also Bennett*, 607 F.3d at 1085 (corporations are persons within the meaning of federal officer removal statute); *Isaacson*, 517 F.3d at 135; *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998).

---

[2] In removing this action, Jacobs does not waive any defenses, objections, or motions available under state or federal law.

5

Case 3:18-cv-00153-TAV-HBG   Document 1   Filed 04/17/18   Page 5 of 20   PageID #: 5

### 2. Jacobs "acted under" the direction of federal officers and/or agencies in performing its contractual obligations.

The Supreme Court has broadly defined and liberally construed the phrase "acting under," in considering federal officer removal under 28 U.S.C. § 1442. *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147-52 (2007). The Court has held that the term "acting under" a federal agency in 28 U.S.C. § 1442(a)(1) refers to a relationship that involves subjection, guidance, or control and a private person "acting under" a federal agency "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id*. at 152 (emphasis added).

"Government contractors fall within the terms of the federal officer removal statute . . . when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Id*. at 153. The Sixth Circuit has further explained that when analyzing whether a private firm is "help[ing]" or "assist[ing]" a federal officer, such that its assistance satisfies the "acting under" requirement, the "answer . . . lies in the fact that the private contractor in such cases is helping the Government to produce an item that it needs . . . " and that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Bennett*, 607 F.3d at 1086-87.

In this case, Jacobs "acted under" the authority of, and at the direction of, *both* the United States Environmental Protection Agency ("EPA") and TVA. As an initial matter, TVA was given the authority to manage the cleanup at issue by EPA, a federal agency. During the initial emergency response phase, and pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601, *et seq*. ("CERCLA"), the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. §§ 300.1, *et seq*. (2008) ("NCP"), and Executive Order No. 12,580, "EPA delegated its authority to TVA to engage in coal ash removal actions" at Kingston. *See Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 998 (E.D.

Tenn. 2010). EPA terminated the initial emergency-response phase on January 11, 2009, and transferred lead agency authority to TVA for further clean up, removal, and remediation. *Id.*

As this Court and others have recognized, TVA is also a federal agency, and its employees are federal officers. Specifically, TVA is both a corporate agency and an instrumentality of the United States, created by and existing pursuant to the Tennessee Valley Authority Act of 1933. 16 U.S.C. § 831 *et seq. See also Hill v. U.S. Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995) (describing TVA as "a wholly-owned corporate agency and instrumentality of the United States"); *Hendricks v. Governor's Taskforce for Marijuana Eradication*, 2007 WL 3396480, at *4 (E.D. Tenn. Nov. 14, 2007) (holding that TVA is a federal agency and that its employee, a law enforcement officer, was a federal officer).

After EPA delegated its lead agency authority, TVA engaged Jacobs to assist in the cleanup project. Jacobs and TVA entered into a written contract, with an effective date of February 6, 2009 (the "Jacobs/TVA contract"), that established Jacobs' role and obligations relating to the Kingston Ash Recovery Project. A true and accurate copy of the Jacobs/TVA Contract is attached as **Exhibit A**, to the Declaration of Jacobs' Project Manager Jack Howard ("Howard Dec. ¶¶ 1-22") attached hereto as **Exhibit 3**.[3] That contract, which Plaintiffs refer to numerous times in their Complaint, states that Jacobs' role is to "provide[] for project planning, oversight and environmental services *to assist TVA* in the Kingston Dredge Cell Incident recovery and remediation." Ex. 3-A:JEG0071456 (emphasis added). The contract specifically designates Jacobs as TVA's "prime contractor providing project planning, management and oversight *to*

---

[3] A citation to a provision located in the Jacobs/TVA contract, which is attached as Exhibit A to the Declaration of Jack Howard attached hereto as **Exhibit 3** would be identified in this Notice of Removal according to the Bates Number ("(Ex. 3-A:JEG0071455)").

7

*assist TVA* in overall recovery and remediation associated with this incident." *Id.* (emphasis added). It also specifically provides that Jacobs "shall manage the Program *with TVA oversight.*" Ex. 3-A:JEG0071373 (emphasis added). It provides that Jacobs is to perform the services of the contract *"when and as requested by TVA"* and that Jacobs will provide services "as authorized by the contracting officer and under the direction of the Technical Contract Manager." Ex. 3-A:JEG0071463 (emphasis added).

Critically, EPA's role in the cleanup project did not end with its delegation of lead agency authority to TVA. On May 11, 2009, TVA entered into an Administrative Order on Consent ("AOC") with the EPA Region 4 Office to further address the clean-up of the Kingston site. A true and accurate copy of the AOC is attached hereto as **Exhibit 4**. The AOC specifically provided that TVA and EPA were entering into the agreement to "provid[e] for *cooperative* implementation of the response actions at the Site pursuant to their authorities under [CERCLA], as amended, and the National Contingency Plan (NCP) . . . ." Ex. 4:JEG0132880 (emphasis added). The AOC directed TVA to submit for EPA review and approval a health and safety plan to ensure the protection of the public health and safety during performance of work on the Project, in accordance with EPA's Standard Operating Safety Guide and consistent with OSHA provisions for response action worker safety and health found in 29 C.F.R. Part 1910. Ex. 4:JEG0132894, ¶ 35. The AOC also mandated that TVA incorporate all changes to the health and safety plan recommended by the EPA, and that it implement the health and safety plan during the pendency of the response (*i.e.,* clean-up) actions. *Id.*

Pursuant to the Jacobs/TVA contract and the AOC, and with the express approval of TVA, Jacobs prepared and provided to TVA for review and approval a comprehensive Site Wide Safety and Health Plan ("SWSHP"), written to apply to CERCLA activities. A true and accurate copy of

Revision 03 of the SWSHP is attached as **Exhibit B** to the Declaration of Jack Howard.[4] Both TVA and the EPA reviewed and ultimately approved, on June 30, 2009, Revision 03 of the SWSHP, which was the first version of the SWSHP written to apply to CERCLA activities. Ex. 3 ¶¶ 12-13. The SWSHP was revised six times and was approved by TVA and EPA. *Id.* ¶ 12.

All of the work performed by Jacobs that is at issue in this case was governed by the versions of the SWSHP that were reviewed and approved by both TVA and EPA. *Id.* ¶¶ 12-19; 21. "The SWSHP applies to all general construction activities at the site, as well as to CERCLA remediation activities in accordance with the EPA's Standard Operating Safety Guide and 29 C.F.R. § 1910.120, which governs hazardous-waste operations and emergency response." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 644 (6th Cir. 2015). "A wide range of topics is addressed in the SWSHP, including the site's potential hazards, health-hazard monitoring, and training. The SWSHP also sets forth the minimum personal protective equipment (PPE) required for workers, as well as a protocol for site controls, work zones, and personal hygiene." *Id.*

Subsequent amendments to the Jacobs/TVA contract further confirm that Jacobs' role, at all times relevant to this case, was to assist TVA and serve as its agent with respect to the particular tasks for which TVA gave Jacobs responsibility. Amendment 4, which addresses Phase 2[5] of the

---

[4] A citation to a provision located in the SWSHP, which is attached as Exhibit B to the Declaration of Jack Howard attached hereto as **Exhibit 3** would be identified in this Notice of Removal as ("(Ex. 3-B:JEG0000939)").

[5] The Jacobs/TVA contract divides Jacobs' scope of work, and the professional consulting services to be provided by Jacobs to TVA, into two phases. Ex. 3-A:JEG0071456. The first phase (Phase 1) of the work called for Jacobs to provide assistance to TVA in: (1) developing the Corrective Action Plan ("CAP") ordered by the TDEC; (2) reviewing and providing input on the Phase 1 dredging plan and engineering the Phase 2 dredging plan; (3) defining the project management structure for drainage management and ash recovery; and (4) reviewing TVA's public relations and community relations plans, and developing/revising those plans. *Id.* (emphasis added). The second phase of Jacobs' scope of work (Phase 2), as set out in Amendment 4 of the Jacobs/TVA contract, provides that Jacobs is to develop and implement a Project

9

work performed by Jacobs on the Kingston Ash Recovery Project, generally describes Jacobs' role as "manag[ing] the Program *with TVA oversight*." Ex. 3-A:JEG0071366 (emphasis added). Similarly, Amendment 6 specifically provides that Jacobs was TVA's *agent* for purpose of managing TVA's health and safety program[6]:

> Due to Jacobs's assigned duties with regard to safety at the Kingston dredge cell recovery site, TVA acknowledges and agrees that Jacobs is TVA's agent for purposes of the various indemnifications that TVA has received in contracts and agreements with contractors, vendors, and suppliers for the dredge cell recovery effort and for purposes of the additional insured provisions of those contracts or agreements.

Ex. 3-A:JEG0071371.[7]

In practice, Jacobs and TVA did, in fact, comply with the requirements pertaining to oversight and supervision that are set forth in the Jacobs/TVA contract and in the SWSHP, including the requirements pertaining to review and approval by EPA. *See* Ex. 3, Howard Dec. ¶¶ 8-12, 15-19. In particular, as described in the Affidavit of Jack Howard, Jacobs' former Project Manager, at all times relevant to the allegations in Plaintiffs' Complaint, Jacobs acted under the detailed direction of an officer of TVA. *Id*. ¶¶ 6, 9. Under their arrangement, Jacobs' personnel worked closely with and under the control of TVA personnel who were responsible for overseeing

---

Management Plan for TVA that will include all services necessary for execution of the KIF Dredge Cell Incident Recovery Program. Ex. 3-A:JEG0071366.

[6] Plaintiffs' allegations against Jacobs in this case primarily relate to Jacobs' alleged failure to properly manage TVA's health and safety program which included, among other responsibilities, the management of the air monitoring program at Kingston. [*See generally* Complaint].

[7] Similarly, Section 3.1.1 of the Safety Integration section of the Project Management Plan, which was adopted and approved by TVA and Jacobs, expressly provides that TVA's Site Safety Official provides oversight for TVA, its contractors and all work associated with the and that "*Jacobs is TVA's agent to manage its Health and Safety Program for the KRP*." (emphasis added). *See* **Exhibit 5**, JEG0000390.

10

the KRP. *Id.* ¶ 6. Over the course of the project's duration, TVA closely monitored and approved every facet of the project. *Id.* TVA representatives were physically located on site to supervise, review and approve Jacobs' execution of its contract responsibilities, and Jacobs' personnel communicated with TVA personnel concerning site work and activities on a daily basis. *Id.* ¶ 10. In addition, the EPA audited and performed an assessment on a quarterly basis of the safety program, including an extensive audit of the ambient and mobile air monitoring program that the Plaintiffs claim was inadequate. *Id.* ¶ 11.

In sum, all of the Plaintiffs' claims against Jacobs, which arise out of their participation in the Kingston Ash Recovery Project, are based upon activities that were directed, supervised, and conducted under the authority of two separate federal agencies, TVA and EPA. All such activities were performed pursuant to the Jacobs/TVA contract and the amendments thereto, which were reviewed and approved by TVA (under authority that was delegated to TVA by EPA). The activities at issue were also governed by various iterations of the SWSHP, which were reviewed and approved by TVA and EPA.[8] And these requirements were not mere window dressing. Jacobs' personnel worked under the direction of TVA officers, who closely monitored and approved the work that Jacobs performed. Jacobs' employees routinely communicated with and were directed by TVA personnel.

Under these circumstances, the Court should easily conclude that the working relationship between Jacobs and TVA on the Kingston Ash recovery project, and even the working relationship

---

[8] Notably, Plaintiffs have alleged as much in their Complaint, as they effectively acknowledge that the conduct at issue by Jacobs was done in support of TVA. Plaintiffs allege in their Complaint that Jacobs was "contracted" and "directed" by TVA to "provide a safe environment for all workers at the KIF toxic spill remediation site. . . ." *See* **Ex. 1**, Complaint at ¶ 8. Plaintiffs further allege that Jacobs created and adopted the SWSHP to provide complete safety oversight for TVA. *Id.* at ¶¶ 8, 10.

11

between Jacobs and EPA on the project, were very close ones, involving detailed regulation, monitoring, oversight and supervision. *See Bennett*, 607 F.3d at 1086-87. Moreover, under the AOC, it is apparent that absent the assistance provided by Jacobs, TVA would have had to perform the work at issue in this case. *See id*. Under the Jacobs/TVA contract and the SWSHP, Jacobs was clearly "helping the Government to produce an item that it need[ed] . . . ," and that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* For all these reasons, Jacobs satisfies "acting under" requirement found in Section 1442(a)(1).

### B. Jacobs "Performed the Actions for Which it is Being Sued 'Under Color of Federal Office.'"

In order to show that it was acting "under color of federal office," Jacobs "must show a nexus, a 'causal connection' between the charged conduct and the asserted official authority." *Bennett.*, 607 F.3d at 1088 (quoting *Jefferson Co., Al.*, 527 U.S. at 431). "In other words, the removing party must show that it is being sued because of the acts it performed at the direction of the federal officer." *Id*. (citing *Watson*, 551 U.S. at 148). To meet this standard, Jacobs "must only establish that the act that is the subject of Plaintiffs' attack . . . occurred while [Jacobs was] performing [its] official duties." *Id*. (citing *Isaacson*, 517 F.3d at 137-38). As noted in *Bennett*, the Supreme Court has indicated that "[t]he hurdle erected by this requirement is quite low." *Id.* (citing *State of Maryland v. Soper*, 270 U.S. 9, 33 (1926) ("[i]t is enough that the [federal officer's] acts or [] presence at the place in performance of his official duty constitute[s] the basis" for the lawsuit).

In this case, there is clearly a "causal nexus" between acts committed by Jacobs under federal authority and Plaintiffs' claims, as all of Plaintiffs' claims arise out of the Plaintiffs' and Jacobs' participation in the Kingston Ash Recovery Project. All of the Plaintiffs' claims (*i.e.,* negligence, assault and battery, negligence per se, intentional/reckless failure to warn, reckless

12

infliction of emotional distress, fraud, misrepresentation/fraudulent concealment, and strict liability for ultra-hazardous or abnormally dangerous activity) relate to acts that Jacobs performed (or allegedly failed to perform properly) pursuant to its contractual relationship with TVA and the SWSHP, which Jacobs drafted at the direction of TVA, and that was reviewed and approved by TVA and EPA.[9]  Therefore, Jacobs has shown that it "acted under" a federal officer, for purposes of federal officer removal under 28 U.S.C. § 1442.

### C. Jacobs Hereby Alleges Three Colorable Federal Defenses to Plaintiffs' Claims.

Jacobs asserts three separate colorable federal defenses to Plaintiffs' claims.  First, Jacobs states that it is entitled to derivative sovereign immunity under *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18 (1940).  Second, Jacobs avers that it is entitled to federal contractor immunity, as set forth in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).  Third, as a government contractor, Jacobs avers that it is entitled to the protections set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

At this stage in the proceedings, Jacobs need not show that any of these defenses will prevail, but only that one of the defenses is plausible.  *See Mesa*, 489 U.S. at 129; *Willingham*, 395 U.S. at 409 (holding that a defendant need only "put in issue the questions" in order to allow "the validity of [his] defenses [to] be determined in the federal courts").  For the reasons set forth below, the defenses asserted easily qualify as "colorable" under these standards.  Indeed, both Sixth Circuit Court of Appeals and this Court have already issued opinions that strongly suggest that

---

[9] By way of example, Plaintiffs have alleged that *Jacobs* refused to allow Plaintiffs to use appropriate respiratory equipment, even when workers presented Jacobs' employees with prescriptions recommending the use of such devices. (*See* Complaint ¶¶ 27-28.)  The use of respiratory equipment, and the circumstances in which the use of such equipment was required and/or permitted, was specifically addressed in the SWSHP. Ex. 3 Howard Dec. ¶¶ 14, 21; Ex. 3-B:JEG0001006-JEG0001061.

13

Jacobs' *Yearsley* immunity defense would be potentially viable in this case. *See Adkisson*, 790 F.3d at 648; 2/15/17 Memorandum and Order, *Adkisson et al. v. Jacobs Engineering Group, Inc.*, Case No. 3:13-CV-505, Doc. 137, at 29-36 (hereinafter, "*Adkisson* Order"). And this Court has also already found, under the same facts and circumstances, that that there are questions of material fact as to whether Jacobs would be entitled to federal contractor immunity under *Campbell-Ewald Co.* [*See Adkisson* Order, at 36-38.]

### 1. Government Contractor/*Yearsley* Immunity

The United States Supreme Court established the concept of derivative immunity for parties acting under the direction and control of the federal government in the exercise of legitimate federal authority in *Yearsley*, 309 U.S. at 20-21. The purpose of derivative immunity is not to protect private parties *per se*, but is "a means of protecting the government's discretionary authority over areas of significant federal interest." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 89-90 (2d Cir. 2008). The principle of derivative sovereign immunity has been routinely applied by federal courts in dismissing tort suits against government contractors. *See, e.g., In re KBR*, 744 F.3d 326, 343 (4th Cir. 2014) (citing *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000)); *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196 (5th Cir. 2009) (applying derivative sovereign immunity to a public works contract).

As an initial matter, this Court held in 2010 that TVA could not be held liable for allegations relating to TVA's decisions and conduct regarding what policies and procedures would govern disposal, clean up, removal, and remediation of the surrounding area following the ash spill. *Mays v. TVA,* 699 F. Supp. 2d at 1004-11; 1022; *see also In re TVA Ash Spill Litig.*, 787 F. Supp. 2d 703, 725 (E.D. Tenn. 2011) ("*TVA Ash Spill Litig. I*") (holding same). In reaching that determination, the Court recognized that TVA's post-spill conduct (and thus any part of that post

spill conduct delegated to Jacobs by contract) was being conducted pursuant CERCLA and the NCP subparts involving hazardous substances. *Mays*, 699 F.Supp.2d at 1022 (citing 40 C.F.R. § 300.400(h)).

This Court also subsequently held that derivative immunity exists for government contractors working for the TVA on the ash spill recovery project. In *Chesney v. TVA*, this Court, applying *Yearsley*, held that if the discretionary function exception protected conduct and/or decisions made by the TVA, then TVA contractors "cannot be held liable for their conduct in regard to the same challenged conduct and/or decisions." *Chesney*, 782 F. Supp. 2d at 586. Under *Mays* and *Chesney*, alone, the Court should easily conclude that Jacobs, a TVA contractor, would have a colorable *Yearsley* defense in this case.

However, the Court need not consider whether those decisions are distinguishable from the present case, as both the Sixth Circuit Court of Appeals and this Court have previously considered whether *Jacobs*, in particular, could rely upon the *Yearsley* immunity defense in cases involving the exact same facts and circumstances as this case. In *Adkisson v. Jacobs Eng'g Grp*., *Inc.,* the Sixth Circuit reversed this Court's dismissal of the plaintiffs' claims based on derivative sovereign immunity, based upon its determination that this Court should have applied Fed. R. Civ. P. 12(b)(6), rather than under Rule 12(b)(1), in deciding the motion to dismiss. *Adkisson*, 790 F.3d at 645. However, in reaching its decision, the Sixth Circuit acknowledged the potential applicability of the *Yearsley* immunity doctrine and remanded the cases. *Id*. In particular, the court acknowledged that dismissal would be appropriate under *Yearsley* if: (1) Jacobs' conduct was discretionary, *i.e.,* that the challenged conduct took place within a permissive framework of general government guidance rather than in response to mandatory government directives or instructions; and (2) Jacobs' discretionary conduct involved policy-level decisions and judgments,

such as the appropriate response to hazards at the Kingston site, as well as the balancing of health, safety, and efficiency concerns, all of which the discretionary function exception was designed to shield. *Id.*

On remand, Jacobs' motion to dismiss was converted to a motion for summary judgment; one of the issues addressed in that motion was Jacobs' *Yearsley* immunity defense. [*See Adkisson* Order, at 28-38.] The Court denied the motion, holding that in the light most favorable to plaintiffs, there were questions of material fact as to whether Jacobs acted within the scope of the authority conferred by TVA when performing the alleged acts that gave rise to the plaintiffs' claims. Namely, the Court held that there was:

> evidence in the record that [Jacobs] would be acting contrary to the will of the government if it: (1) did not randomly select workers for mobile monitoring; (2) manipulated the monitoring results; (3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash; (4) did not honor prescriptions for dust masks or respirators; (5) communicated to workers that fly ash was safe to consume; and/or (6) threatened workers when they asked for dust masks or respirators.

[*Id.* at 30.] Based upon those findings, the Court held that there was a material question of fact as to whether Jacobs could satisfy the prerequisites for *Yearsley* immunity, and as to whether Jacobs should be protected by any derivative sovereign immunity. In other words, the Court determined that the defense was available to Jacobs, but that there were disputed material facts relevant to the determination of whether it would shield Jacobs from liability.

The decisions by the Sixth Circuit and this Court in *Adkisson*, which involve the exact same facts and circumstances at issue here, firmly establish that *Yearsley* immunity is *at least* a plausible defense in this case.

## 2. Federal Contractor Immunity Under *Campbell-Ewald Co.*

A second plausible defense to Plaintiffs' claims is that Jacobs has immunity as a federal contractor. Six months after the Sixth Circuit remanded *Adkisson*, the Supreme Court decided *Campbell-Ewald Co.*. While neither citing nor mentioning the Sixth Circuit's *Adkisson* decision or the discretionary function test, the Supreme Court clarified and expanded *Yearsley* qualified immunity in a different fashion, stating that government contractors are immune from third-party suits for work performed within the scope of their contracts, unless a Plaintiff can establish that the contractor failed to comply with explicit or "clearly established" government directions or requirements. *See Campbell-Ewald Co.*, 136 S. Ct. at 673.

In this case, Jacobs has been sued for performing work "pursuant to [its] contractual undertakings with the United States." *Id*. TVA hired Jacobs to perform program management and site safety functions at the Kingston site, and Plaintiffs allege that Jacobs performed those tasks negligently and/or recklessly. Under the *Campbell-Ewald* test, Jacobs is immune from third-party liability for the work it performs under the Jacobs/TVA contract, unless the plaintiffs can establish that Jacobs acted contrary to specific or "clearly established" government requirements. *See id*.

This Court already determined, in *Adkisson*, that there were questions of material fact as to whether Jacobs, in fact, exceeded its authority and acted contrary to the requirements of the Jacobs/TVA contract and the SWSHP. [*See Adkisson* Order, at 36-38.] While this Court disagreed with Jacobs' interpretation of *Campbell-Ewald Co.* in its opinion in *Adkisson* [*see id*.], the Court should nevertheless conclude that Jacobs' reliance upon that a federal contractor immunity defense in this case, which involves the same facts and circumstances, is at least plausible, for purposes of determining whether removal under the Federal Officer Removal statute is appropriate.

### 3. The Government Contractor Defense

The government contractor defense is a third colorable federal defense that Jacobs intends to rely upon in this case. Under the government contractor defense, liability for services performed under a federal government contract cannot be imposed, pursuant to state law, when: (1) the United States approved reasonably precise specifications; (2) the contractor's performance conformed to those specifications; and (3) the contractor warned the United States about the dangers that were known to the contractor but not to the United States. *Boyle*, 487 U.S. at 512.

Jacobs' reliance upon the government contractor defense is clearly colorable. The Declaration of Jacobs' Project Manager Jack Howard demonstrates that (and at least creates a question of fact as to whether): (1) the conduct by Jacobs at issue was performed pursuant to reasonably precise contracts, protocols and procedures reviewed and approved by TVA and/or EPA (e.g., the Jacobs/TVA contract and the SWSHP); and (2) Jacobs' activities conformed to the contracts and requirements approved and adopted by TVA and EPA. *See* **Ex. 3**, Howard Dec. ¶¶ 5-22. According to Mr. Howard, communications between Jacobs' personnel and TVA representatives occurred on a daily basis, and as often as needed, to keep TVA apprised of developments with the project, including those relating to site safety, and to communicate instructions and approvals relating to the SWSHP. *Id.* at ¶ 10. *See Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000) (continuous "back and forth" between government and contractor tends to establish first prong of government contractor defense).

With regard to *Boyle*'s third element, the approval by TVA and EPA of multiple versions of the SWSHP demonstrates that TVA and EPA were fully aware of the risks associated with the fly-ash removal and remediation activities at issue in the Complaint. *See Adkisson*, 790 F.3d at 644 ("A wide range of topics is addressed in the SWSHP, including the site's potential hazards,

18

Case 3:18-cv-00153-TAV-HBG   Document 1   Filed 04/17/18   Page 18 of 20   PageID #: 18

health-hazard monitoring, and training."). To the extent that Plaintiffs allege that there were additional dangers that Jacobs failed to tell TVA and EPA about, that issue is clearly a question of fact for the jury to decide.

In sum, it is clearly plausible that Jacobs will be able to satisfy all three prongs of the *Boyle* test in this case.[10]  *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1334-35 (11th Cir. 2003) (governmental contractor defense was applicable to a performance contract); *Richard-Lexington Airport District v. Atlas Properties, Inc.*, 854 F. Supp. 400, 423-24 (D.S.C. 1994) (remediation contractor hired by the United States Environmental Protection Agency held entitled to rely on government contractor defense for claims arising out of remediation activities).

## CONCLUSION

WHEREFORE, Jacobs prays that the above-described action pending in the Circuit Court for Roane County, Tennessee be removed therefrom to this Court.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By: /s/ James F. Sanders
James F. Sanders    No. 005267
jsanders@nealharwell.com
J. Isaac Sanders    No. 029372
isanders@nealharwell.com
Marie T. Scott    No. 032771
mscott@nealharwell.com
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713

---

[10] This Court has previously suggested that the government contractor defense may only apply to military procurement contracts. *See Chesney*, 782 F. Supp. 2d at 582. At least for purposes of federal officer removal, however, the government contractor defense is a plausible defense even though this case involves non-military contracts. *See Bennett*, 607 F.3d at 1089-90.

19

Facsimile: (615) 726-0573

**SMITH CASHION & ORR, PLC**
S. Joe Welborn (No. 21747)
jwelborn@smithcashion.com
Joshua K. Chesser (No. 27993)
jchesser@smithcashion.com
231 Third Avenue North
Nashville, Tennessee 37201
Telephone: (615) 742-8555
Facsimile: (615) 742-8556

*Attorneys for Defendant Jacobs Engineering Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 16th day of April, 2018, I have served the foregoing document upon the following counsel of record as indicated below.

| | | |
|---|---|---|
| [ ] | U.S. Mail | John B. Dupree, Esq. |
| [ ] | Facsimile | Keith D. Stewart, Esq. |
| [ ] | Email | James K. Scott, Esq. |
| [x] | Overnight Mail | Market Street Law, PLLC |
| | | 625 Market Street, 14th Floor |
| | | Knoxville, TN 37902 |
| | | John.dupree@knoxtnlaw.com |
| | | keithdstewaret@gmail.com |
| | | Jimscott264@gmail.com |

/s/ James F. Sanders