# Exhibit 3

# DECLARATION OF JACK HOWARD

I, Jack Howard, declare the following:

1. My name is Jack Howard. I am over the age of eighteen (18) years. The facts stated herein are within my personal knowledge and are true and accurate.

2. I was employed by Jacobs Engineering Group, Inc. ("Jacobs") as a Project Manager for almost eight (8) years until I retired in September 2016.

3. During my eight years of employment with Jacobs I served as Jacobs' project manager for the Kingston Dredge Cell Incident Recovery Program Project at the Tennessee Valley Authority ("TVA") Kingston Fossil Fuel Plant located in Kingston, Tennessee (hereinafter the "Kingston Ash Recovery Project").

4. In my capacity as project manager for Jacobs on the Kingston Ash Recovery Project, I had personal knowledge of and was familiar with Jacobs' procedures relating to the execution and retention of contracts entered into between Jacobs and other entities in connection with the Kingston Ash Recovery Project.

5. On or about February 9, 2009, Jacobs entered into a written contract with an effective date of February 6, 2009 with TVA (the "Jacobs/TVA contract"), whereby Jacobs agreed to provide professional services associated with management of the Kingston Ash Recovery Project. A true and correct copy of the Jacobs/TVA contract is attached hereto as **Exhibit A**. In general, TVA contracted with Jacobs to provide project management and other support services to assist TVA in the Kingston Ash Recovery Project.

6. I was intimately involved with Jacobs' work on the Kingston Ash Recovery Project. I worked closely with, and under the control of, TVA personnel who were responsible for overseeing the Project. Over the course of the Project's duration, TVA closely monitored,

1

controlled and approved every facet of the Project effort.

7. I am aware that a number of lawsuits have been filed against Jacobs in connection with Jacobs' work under the Jacobs/TVA contract, and am generally familiar with the types of allegations contained in those lawsuits.

8. TVA had a significant level of control and supervision over every aspect of Jacobs' work on the Kingston Ash Recovery Project, including the initial evaluation and approval of a comprehensive Site Wide Safety Health Plan ("SWSHP"), and the overall project management that is alleged to be deficient or defective in the lawsuits filed against Jacobs. This control and supervision was not only by TVA, the federal entity that contracted with and supervised Jacobs, but also other federal agencies, including, but not limited to the Environmental Protection Agency ("EPA"), which had regulatory and oversight responsibilities over the Kingston Ash Recovery Project, TVA, Jacobs, and the TVA-contracted site employees and subcontractors.

9. At all times that Jacobs provided project management and other support services (including management of the SWSHP) to assist TVA in the Kingston Ash Recovery Project, Jacobs and all of its employees acted under the detailed direction of an officer of the TVA, pursuant to the Jacobs/TVA contract. For example, page 9 of the contract specifically provides under the sub-heading "Contractor Responsibilities" that Jacobs is to perform the services of the Contract "when and as requested by TVA" and that Jacobs will provide services "as authorized by the contracting officer and under the direction of the Technical Contract Manager." The Contract further provides on page 22 under the sub-heading "TVA and Contractor Representatives" that the "Contracting Officer (Beth Sirene Madison) is TVA's duly authorized representative for all purposes…" and that the "Contracting Officer may designate a Technical

2

Contract Manager (TCM)" who "will act for TVA in regard to all technical matters under the contract . . . ."

10. Throughout the period in which Jacobs worked on Kingston Ash Recovery Project, TVA representatives were physically located on site to supervise, review and approve Jacobs' execution of its contract responsibilities as well as other work on the Project. Jacobs' personnel routinely communicated with TVA personnel concerning site work and activities. Communications between Jacobs' personnel and TVA representatives occurred on a daily basis, and as often as needed, to keep TVA informed as to developments on the Project, site safety, and to review and discuss instructions and approvals from TVA.

11. Throughout the period in which Jacobs worked on the Kingston Ash Recovery Project, TVA, through its own on-site construction and safety personnel, was intimately aware of potential issues associated with project performance. TVA personnel conducted daily, weekly, monthly, and periodic Project meetings with Jacobs, the EPA, and other on-site contractors. Moreover, the EPA audited and performed an assessment on a quarterly basis of the safety program at the Kingston Ash Recovery Project, including an extensive audit of the ambient and mobile air monitoring program (which the Plaintiffs in the afore-mentioned lawsuits claim was inadequate).

12. As directed by the Jacobs/TVA Contract, and in order to assist TVA with the Kingston Ash Recovery Project, Jacobs and TVA developed the SWSHP, which governed the overall health and safety program for the Project. The SWSHP was approved and adopted by TVA and the EPA. The SWSHP was revised six times during the course of the Kingston Ash Recovery Project, and was approved and adopted by TVA and the EPA. Revision 3 to the SWSHP dated June 30, 2009 is attached hereto as **Exhibit B**.

3

13. The SWSHP was written to apply to all Site general construction activities as well as CERCLA remediation activities, in accordance with EPA's *Standard Operating Safety Guide* and 29 CFR 1910.120.

14. The SWSHP describes the potential hazards at the Site, the means and methods to be used for health hazard monitoring at the Site. The SWSHP also sets forth OSHA/TOSHA-compliant policies, procedures and protocols for health hazard monitoring or industrial hygiene sampling/monitoring ("IH monitoring"), the use of personal protective equipment (including the use of respiratory equipment), medical surveillance and support requirements (including respirator use qualifications), safety training, hazard communication, and personal hygiene/work controls.

15. All contractors on site were required to comply with the requirements of the SWSHP.

16. The SWSHP sets forth detailed information regarding the constituents of fly ash, including the site action levels and site exposure limits for the constituents, which are set forth in Table 4-1. The site action levels for fly ash constituents as set forth in the SWSHP are set at levels which are more conservative than the permissible exposure limit (PEL) standards set by OSHA or TOSHA. The PEL is the limit assigned for a constituent by OSHA (whether Federal or state). Thus, the PEL is the regulatory limit. As referenced in Table 4-1 of the SWSHP, in addition to setting Site PELs for fly ash constituents at the more conservative of the PEL standards set by OSHA or TOSHA, Jacobs also used the engineering discretion granted to it under 29 CFR Part 1910 to set the Site Action Level for fly ash constituents at 50% of the applicable PEL. By setting the Site Action Levels for fly ash constituents at 50% of the applicable PEL, Jacobs and TVA ensured that they would have the opportunity to initiate further

4

reviews, perform further evaluations, and implement engineering controls and work practices as needed to reduce and maintain worker exposure to or below the site action level for fly ash constituents.

17. Industrial Hygiene (IH) monitoring at the Kingston Ash Recovery Project was performed by two contract partners to TVA. From December 30th, 2008 through May of 2010, EnSafe, Inc. ("EnSafe") performed the IH monitoring. From July of 2010 to the end of project completion, Jacobs performed the IH monitoring utilizing and following the protocols for IH monitoring as set forth in Appendix K of the SWSHP Revision 5 dated October 2010, which is attached hereto as **Exhibit C**.

18. Jacobs utilized staff members trained and experienced in the IH protocols for obtaining the field samples. At all times, these staff members followed the protocols and specifications for IH monitoring set forth in the SWSHP. Additionally, Jacobs had a Certified Industrial Hygienist (CIH) on staff who reviewed and interpreted the results, and made recommendations to site management. Those recommendations were regularly submitted by Jacobs to TVA.

19. Personal sampling was conducted by both EnSafe and Jacobs' personnel. TVA personnel and contractors were among the individuals who were monitored. Jacobs' IH Monitoring was subjected to numerous internal and third party reviews, including reviews by the EPA. Those reviews and audits confirmed that Jacobs had conducted IH Monitoring in accordance with the TVA/Jacobs Contract and the SWSHP. Data collected by EnSafe and Jacobs, for personnel exposure, consistently showed that regulatory standards as set forth in the SWSHP were not exceeded, and personnel exposure to trace elements in the ash were below any established action limits as set forth in Table 4-1 of the SWSHP. The results of IH monitoring

5

Case 3:18-cv-00153-TAV-HBG   Document 1-4   Filed 04/17/18   Page 6 of 8   PageID #: 68

from both EnSafe and Jacobs indicated the same results.

20. I have reviewed the allegations contained the afore-mentioned lawsuits filed against Jacobs wherein it is alleged by the plaintiffs that Jacobs primarily allowed mobile air monitoring units to be worn only on days of rain when the fly ash would not be airborne, that Jacobs engaged in a practice of misrepresenting results, that Jacobs tested in a manner to unsafely alter the readings and that when high readings would occur beyond permissible exposure limits that Jacobs would destroy the air monitoring records. These allegations are false. Rather, the SWSHP sets forth the expectations and requirements for IH monitoring, and those expectations and procedures were followed by Jacobs' personnel.

21. Multiple portions of the SWSHP describe the methods for selection of PPE on site, as well as the risk-based processes for determining the appropriate PPE that would be protective of workers without creating new and avoidable hazards. In 29 CFR 1910.134(c)(2) and Appendix D, OSHA describes "voluntary use" of a respirator when a respirator is not required. The site process for this can be found in the SWSHP under Appendix C section 10.0. Jacobs followed all of the requirements set forth in the SWSHP (as well as the requirements of 29 CFR 1910.134) pertaining to PPE, including the provisions pertaining to both required and voluntary use of respirators, throughout the duration of the Kingston Ash Recovery Project.

22. I have also reviewed allegations contained in the various lawsuits wherein it is alleged that Jacobs denied Plaintiffs appropriate and/or timely safety training and provided inadequate medical monitoring. Since IH monitoring data collected by EnSafe and Jacobs for personnel exposure to fly ash constituents consistently showed that regulatory standards as set forth in the SWSHP were not exceeded, and personnel exposure to trace elements in the ash were below any established action limits as set forth in Table 4-1 of the SWSHP, medical monitoring

6

was not required pursuant to Section 9.0 of the SWSHP. Additionally, Section 11.0 of the SWSHP sets forth the protocols and procedures for health safety training required by the TVA and federal regulatory standards. All employers on-site, including TVA and Jacobs, were required to and did, in fact, comply with the requirements of the SWSHP pertaining to safety training.

I declare under penalty of perjury that the foregoing is true and accurate.

_____
Jack Howard

Sworn to and subscribed before me
this the 13 day of April, 2018.

_____
Notary Public
My Commission Expires: 8/24/2020

7